**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 23 2003**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

DAVID ADKINS, JR.,

   Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

   Defendant-Appellee.

No. 03-7006
(D.C. No. 01-CV-473-S)
(E.D. Okla.)

---

ORDER AND JUDGMENT *

---

Before **MURPHY** and **PORFILIO** , Circuit Judges, and **BRORBY** , Senior Circuit
Judge.

---

   After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\*  This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff David Adkins, Jr. appeals from the denial of social security disability and supplemental security income benefits. We exercise jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. We review the whole record to determine only whether the factual findings are supported by substantial evidence and the correct legal standards were applied. Goatcher v. United States Dep't of Health & Human Servs., 52 F.3d 288, 289 (10th Cir. 1995). We may not reweigh the evidence or substitute our judgment for that of the agency. See Kelley v. Chater, 62 F.3d 335, 337 (10th Cir. 1995). Based on these standards, we reverse and remand the case for additional proceedings.

Facts

Claimant was born in November 1975 and is twenty-seven years old now. He went to public school through the seventh grade and then was home-schooled, but he does not have a high school diploma or its equivalent. Aplt. App. at 199-200. He is married and has one child. His past work was unskilled, heavy work as an oil field worker and at a feed store loading and unloading feed, etc., either by hand or using a forklift. Id. at 160, 200. He alleges a disability beginning on March 27, 1998, when he hurt his back at work on the oil field job lifting a fifty-five gallon trash barrel from the back of a truck. Id. at 159, 203.

Claimant has not worked since his on-the-job injury. He was in so much pain before his surgery that he used crutches to walk. Id. at 151, 153. He has

-2-

made extensive efforts to find the problem and correct it. Ultimately, his treatment was managed from July 28, 1998, through March 12, 1999, by a neurosurgeon, Dr. Glenn Schoenhals. Claimant had first tried chiropractic and then steroid injections directly into the L5-S1 disk space done by an orthopedic surgeon, but neither of those approaches had helped. Dr. Schoenhals ordered a discogram and then recommended surgery.

On September 22, 1998, Dr. Schoenhals and Dr. Hahn performed on claimant a lumbar laminectomy, diskectomy, and Ray cage fusion at L5-S1 to treat "a symptomatic L5-S1 spondylolisthesis with a discogenic pain arising from the L5-S1 disk that appears to be exquisitely sensitized to any type of pressure sensitization." Id. at 116. After surgery, a new MRI showed scar tissue around the nerve roots. Id. at 137. Two months after surgery, Dr. Schoenhals believed that claimant "was vastly improved over his preoperative status but . . . falls well short of the definition of well . . . [and still] has a long course of rehabilitation ahead of him." Id. at 152. Dr. Schoenhals sent claimant for a course of physical therapy visits but did not expect that it would be enough. Id.

Subsequent physical therapy was not very successful to relieve claimant's post-operative pain. Id. at 137. The physical therapist reported that Dr. Schoenhals had decided against further surgery and did not believe that claimant would improve, but wanted to keep him from getting worse. Id.

Dr. Schoenhals acknowledged that claimant was not free from pain, even after he started physical therapy. Id. at 151. Dr. Schoenhals recognized that claimant's complaints of pain, both before and after the surgery, were outside the norm, but did not question that claimant's continued pain was real. He was "still concerned that we should look further because most individuals do far better than David after this [surgery]." Id. at 150. He found an anatomic abnormality, probably due to scar tissue, elevating the nerve root on the right side of L5-S1. Id. at 149.

Dr. Schoenhals ordered a selected nerve root block, id. at 148, which was performed at Mercy Hospital by Dr. Marshall, id. at 132, but it provided claimant only partial and temporary pain relief, id. at 147. Dr. Schoenhals then ordered an EMG/nerve conduction study, which revealed no "correctable anatomical abnormality responsible for [claimant's] pain." Id. at 146 (emphasis added). Dr. Schoenhals decided on March 12, 1999, that claimant was at maximum medical benefit with a twenty-five to thirty percent impairment to the body as a whole, released him with instructions to continue using a prescribed bone stimulator and spinal exercises, and said: "Hopefully, in the future he will improve." Id. He did not recommend further surgery.

Claimant told his attorney that Dr. Schoenhals told him less than a year after the surgery that the fusion did not take, but that Dr. Schoenhals would not return his calls seeking to get this information in writing for the administrative

record. Id. at 114. This was not a new allegation–in May 1999, claimant told a vocational specialist contacted for his worker's compensation claim that he had been told that the fusion did not take. Id. at 109. In addition, the EMG/nerve conduction study done by Dr. Udonta, another neurologist, revealed changes in claimant consistent with low feet temperature and chronic L5-S1 radiculopathies. Id. at 144. Also, Dr. Schoenhals' notes reflect that the purpose of the bone stimulator was to promote fusion, and that claimant was advised to continue using the bone stimulator when Dr. Schoenhals released him from care in March 1999. Id. at 146, 153. These reports suggest that the fusion did not take. On the other hand, Dr. Schoenhals reported that his review of claimant's post-operative X-rays indicated no movement at the intended fused level, id. at 150, which indicates that it did take.

At the hearing, claimant testified that he still suffers pain in his lower back, his tailbone, and down both legs. Id. at 205. He testified that he has used a bone stimulator and TENS unit, both of which were prescribed by doctors. Id. at 209. He also uses a cane for balance while walking, although it was not prescribed by a doctor. Id. at 207. He said that he can stand for fifteen to twenty minutes before needing to sit or lie down. Id. at 208. He can sit for thirty to forty-five minutes. Id. He sometimes goes to the store with his wife, but he uses a wheelchair once they get to the store. Id. at 209. He can walk twenty-five to

thirty yards.  Id. at 209-10.  He can lift eight to ten pounds.  Id. at 210.  He can lift a gallon of milk if he uses the other hand for balance, but he could not walk with the milk in his hand.  Id.  He cannot lift two gallons of milk at the same time.  Id.  His wife helps him get his shoes on and ties them for him.  Id.  He can drive at least seventeen miles, but rarely drives because he is afraid he will not apply enough force to the brake due to pain.  Id. at 211.  He does little during the day because he is up only about two hours at a time; mostly, he either lies down or leans over the bed to get the pressure off his back.  Id. at 208-09.

The ALJ denied the claim at step five of the evaluation sequence, see generally Williams v. Bowen, 844 F.2d 748, 750-52 (10th Cir. 1988), holding that although Mr. Adkins could not return to his past heavy, unskilled work, he retained the residual functional capacity (RFC) to perform the full range of light work and was therefore not disabled under Rule 202.17 of the medical-vocational guidelines (the "grids"), see 20 C.F.R., pt. 404, subpt. P, app. 2.

### Issues on Appeal

On appeal, claimant argues that the ALJ erred:  (1) in applying the grids, and (2) in assessing the credibility of his complaints of pain.  As a subpart of his first issue, he argues that he cannot perform the full range of light work, which precludes the ALJ's conclusive reliance on the grids.  Claimant raised this

sub-issue in the district court as well as in this court. Based on the record and the applicable law, claimant's claims of error have merit.

## Legal Analysis

For the issues raised, there are two crucial points. First, no medical professional has ever described claimant's physical capabilities for walking, standing, or sitting, let alone climbing, bending, stooping, twisting, etc. The only evidence on the subject is the claimant's testimony and a checkmark-style RFC assessment, neither of which provide substantial evidence for the ALJ's finding that claimant can perform the functions of light work Without a properly supported RFC finding, the ALJ erred by relying conclusively on the grids for a determination of nondisability. Second, no medical professional has ever suggested that claimant has exaggerated symptoms, given less than maximum effort to his recovery, or failed to follow prescribed treatment. Therefore, the ALJ had no substantial evidence upon which to base a finding that claimant exaggerated his pain.

## RFC/Conclusive Reliance on the Grids

At step five, the ALJ has the burden to prove that the claimant retains the RFC to perform work other than his past relevant work. Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993). "It is not [the claimant's] burden to prove

[h]e cannot work at any level lower than h[is] past relevant work; it is the [agency's] burden to prove that [h]e can." Id. at 1491.

An ALJ may not rely conclusively on the grids unless the claimant can do the full range of a level of work and most of the jobs in that range. Id. at 1492; see 20 C.F.R., pt. 404, subpt. P, app. 2, § 200.00(d). The use of the grids is inappropriate when a claimant has a nonexertional impairment such as pain, unless the ALJ can support a finding that the claimant's pain is insignificant. Thompson, 987 F.2d at 1488; 20 C.F.R., pt. 404, subpt. P, app. 2, § 200.00(e). If the ALJ cannot rely conclusively on the grids, he "must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual lives or in several regions of the country." Soc. Sec. R. 96-9p, 1996 WL 374185, at *5.

The ALJ should assess RFC once, in detail, at step four. See Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996); 20 C.F.R. §§ 404.1545(b), 416.945(b). The ALJ must make specific findings as to RFC, Winfrey, 92 F.3d at 1023, and these findings must be supported by substantial evidence, see Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999). The ALJ must assess the "physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or

postural functions, such as reaching, handling, stooping or crouching)."

20 C.F.R. §§ 404.1545(b), 416.945(b). The rulings state that

> [i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., <u>8 hours a day, for 5 days a week</u>, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Soc. Sec. R. 96-8p, 1996 WL 374184, at *7 (emphasis added) (footnote omitted).

In this case, the ALJ decided that claimant retains the RFC for the full range of light work, without pointing to any evidence to support his conclusion. See Aplt. App. at 24. The only document that could conceivably support the conclusion is a checkmark-style RFC assessment done by an agency physician. See id. at 165-73. There are two problems with this document. First, we have long held that "[s]uch [checkmark-style] evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence." Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987). This RFC assessment carries a few handwritten lines of notes from the medical evidence, a statement that the assessment is based on the medical evidence, and a conclusion that claimant is not entirely credible. See Aplt. App. at 166, 171. Because the agency physician provided no thorough explanation, however, the

RFC assessment does not constitute substantial evidence under Frey. Second, there is no record evidence to support the conclusions on the form in any event. Of crucial importance to this case is that no doctor has ever defined claimant's capability for walking, standing, or sitting, let alone, bending, twisting, stooping, climbing, etc. There is a total lack of evidence about what he can do. Although Dr. Schoenhals and Dr. Metcalf (claimant's worker's compensation examiner) stated that claimant should be retrained for work other than his past heavy work, they did not define either the level of exertion that claimant could perform or the limitations, if any, on his movement or posture on account of his fusion or his pain. See id. at 146, 161. For these reasons, the ALJ could not make any RFC determination–there is no evidence for it.

The agency expressly requires "[t]he adjudicator [to] . . . make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Soc. Sec. R. 96-8p, 1996 WL 374184, at *5. The ALJ must develop the record for "at least" the preceding twelve months. 42 U.S.C. § 423(d)(5)(B), 20 C.F.R. §§ 404.1512(d), 416.912(d). An ALJ is obligated to develop the record even where, as here, the claimant is represented by counsel, Thompson, 987 F.2d at 1492, because a disability hearing is nonadversarial, id. at 1491. Finding no substantial evidence upon which to base an RFC finding, the ALJ should have recontacted claimant's physicians. White v. Barnhart, 287 F.3d 903, 908

(10th Cir. 2001) (citing 20 C.F.R. § 416.912(e));     see 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 1512(f), 1519a(a)(1).  If any of claimant's doctors has more records than he provided, the ALJ has the power to subpoena them, if necessary.     See Baker v. Bowen, 886 F.2d 289, 292 (10th Cir. 1989); 20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1).  If additional records either do not exist or are insufficient to clarify the inconclusive evidence already in the record, then the ALJ should order a consultative examination.     See 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 1512(f), 1519a(a)(1).

Because the ALJ's RFC finding is not supported by substantial evidence, his decision based on the grids should not stand.

## Credibility

Although credibility is peculiarly the province of the ALJ,     Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995), his "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."     Id. (quotation omitted).  The ALJ's complete discussion of claimant's credibility was this:

> The claimant's assertions concerning his impairment and the impact
> it has on his ability to work are not entirely credible in light of the
> medical history, the reports of the treating and examining physicians,
> findings made on examination and information contained in the
> documentary reports.  Dr. Metcalf and Dr. Schoenhals were of the
> opinion that the claimant could not return to heavy employment but
> did suggest he engage in vocational rehabilitation.  Vocational

-11-

testing showed the claimant had high aptitudes for high tech occupations such as electronics, drafting or computer programming.

Aplt. App. at 24. He also noted that "[t]here is no information in the record to show the current use of any prescribed medication for pain other than Ibuprofen that [claimant] takes for a week or two at a time for inflammation, but he stated it did not help." Id.

The ALJ failed to apply the correct legal standard, failed to support his credibility finding with substantial evidence, and, in fact, contradicted his own finding about claimant's pain.

> When determining the credibility of pain testimony, the ALJ should consider such factors as 'the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.'

Thompson , 987 F.2d at 1489 (quotations omitted).

The ALJ failed to recite these factors, let alone discuss them. As noted above, no medical person has ever suggested that claimant exaggerated his symptoms and should not be in pain. There is simply no evidence to support the ALJ's conclusion that claimant's complaints of pain were not credible. In fact, he expressly found that "[t]he claimant does have severe pain in his back and legs as a result of an injury to his lower back." Aplt. App. at 24. He therefore

-12-

should have addressed the level of pain he found the claimant to have, even though it was not disabling. Thompson, 987 F.2d at 1490-91. This also would have precluded reliance on the grids because the ALJ found that claimant's pain was not insignificant. See id. at 1488.

What the ALJ said about claimant's credibility (as well as what the ALJ did not address) also shows a lack of understanding of the correct legal standards. It appears that the ALJ may have concluded that claimant was not credible because he does not take prescription pain medication. If so, the ALJ erred. The regulations do allow the agency to deny benefits to a claimant who does not follow prescribed treatment without a "good reason." 20 C.F.R. §§ 404.1530(b), 416.930(b). We therefore long ago adopted a four-part test to assess a claimant's failure to pursue treatment: (1) whether treatment would have restored the claimant's ability to work; (2) whether treatment was prescribed; (3) whether treatment was refused; and (4) whether the excuse was justified. See Frey, 816 F.2d at 517. The ALJ failed to apply this analysis to claimant's use of medication. The record is replete with reports from claimant's doctors that no therapy, including drugs, has eliminated his pain.

The ALJ also commented on reports that claimant has an aptitude for some kinds of work for which he has never been trained. This was error. The ALJ confused common aptitudes with transferable work skills. See id. Claimant's

past work was unskilled. According to the regulations, claimant did not acquire any transferable skills by doing unskilled work. 20 C.F.R. §§ 404.1568(a), 416.968(a). If the ALJ cannot identify unskilled jobs that claimant can do, then claimant is entitled to benefits. <u>See</u> <u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1329 (10th Cir. 1992).

<u>Conclusion</u>

For all of these reasons, the ALJ's decision must be reversed and the case remanded for further proceedings.

Entered for the Court

Michael R. Murphy
Circuit Judge

-14-